Morgan *v.* Morgan.

Order affirmed.

[NEW YORK GENERAL TERM, November 24, 1862. *Ingraham, Leonard* and *Clerke,* Justices.]

---

DANIEL MORGAN, *appellant, vs.* SARAH E. MORGAN, a minor, and THOMAS BUCHANAN, jun. her general guardian, *respondents.*

It is not an inflexible rule that the commissions of a guardian cover every thing which can be allowed to him for his services respecting the estate of his ward.

The rule is fairly deducible from the cases that where extra compensation has been applied for and denied, the services for which such remuneration was asked were strictly within the official duties of the executor, guardian or trustee; and that no other recompense can be allowed than such as the statute provides for conducting the administration of the estate in all that legitimately pertains to it.

But the rule is not so narrow and restricted that it denies all compensation to a guardian for services of a personal or professional nature, rendered by him for the benefit of the ward, and in doing which he has bestowed personal labor, and incurred actual expenses, and which have been useful and serviceable to the estate. MORGAN, J. dissented.

THIS is an appeal from a decision of the surrogate of the county of Oneida, rejecting certain items in the account of Daniel Morgan, late general guardian of Sarah E. Morgan. Daniel Morgan was appointed the general guardian of Mary Jane Morgan and Sarah E. Morgan, minors, and the children of his deceased brother, in August, 1851, and continued such guardian of Mary Jane until her death in 1855, and of Sarah E. until February, 1859, at which time, she having become fourteen years of age, and peti-

Morgan *v.* Morgan.

tioning therefor, Thomas Buchanan, jun. was appointed her general guardian. Daniel Morgan was the administrator of the estate of his brother, and the minor Mary Jane died unmarried and intestate, and her estate therefore descended to her sister. The estate of these minors consisted of about thirty building lots in the city of Utica, on which were seven wooden dwelling houses, of which six were of good size and desirable as residences, being located on West and Miller streets, and yielded an average rent of about $125 each, per annum. The other dwelling house was a wooden tenement in West Utica, of inferior description, and produced a mnch smaller rent. The property was under considerable incumbrance, a part of which was paid by a sale of some of the vacant lots under an order of the supreme court, and the interest on the balance was paid from the income of the part remaining unsold. During the guardianship of Morgan these houses needed and received very extensive general repairs, besides the small ordinary and annual repairs incident to that kind of property. All this work was done under the personal supervision of the guardian, who also personally collected the rents, settled and paid all bills, both in reference to the property and the support and education of the minors. In pursuance of an order of the supreme court, a building was erected upon two of the vacant lots; the accounts for the expenses attending this improvement were for the most part rendered to the supreme court, but some of the items were carried into the last part of the guardian's account to the amount of $278.10, and so appeared at the hearing before the surrogate; but by an arrangement made between the parties before the decree was made, these items were deducted, thus reducing by that amount the balance claimed by the guardian to be due to him. The guardian himself performed considerable mechanical labor on the property, and paid sundry small items of expenses connected therewith, and for this labor, and these expenses, he made charges in the accounts which he rendered from year

to year, which charges were examined and adjusted by the surrogate as they were annually presented. These accounts so adjusted were as follows:

| | | |
|---|---|---:|
| For 1853, | . . . . . . . . . . . . . . . . | $25 00 |
| " 1854, | . . . . . . . . . . . . . . . | 121 09 |
| " 1855, | . . $100.23—$35.25, . . . . . | 64 98 |
| " 1856, | . . . ,. . . . . . . . . . . . | 104 05 |
| " 1857, | . . . . . . . . . . . . . . . | 50 00 |
| " 1858, | . . . . . . . . . . . . . . . | 50 00 |
| Total, | . . . . . . . . . . . . . . | $415 12 |

Before adopting this practice, the guardian presented the matter to the surrogate of the county, who after examination of the property and the facts of the case, directed the guardian to pursue this course, and instructed him to make such small repairs as were necessary and as he could do himself with economy and advantage, and present with his annual accounts, detailed statements of what he might do, and the time he might be employed in making such repairs. When the case came before the present surrogate for final settlement, he regarded these charges as illegal, and rejected them on the ground that the compensation of the guardian was confined to his commissions, which covered every kind of service which a guardian, executor or administrator could bestow upon the estate committed to his care. The surrogate also modified other parts of the accounts in such manner that the account against the guardian was increased to the amount of $120.39. A final decree was made by the surrogate, by which a balance of $25.35 was found due to the guardian, and no costs were awarded to either party. From this decree the late guardian appealed to the supreme court, and the counsel of the respective parties by their stipulation provided for the omission from the return of the surrogate of such parts of the proceedings and evidence as

were not necessary for the decision of the issues raised by the appeal and answer.

*O. S. Williams,* for the appellant. I. The charges for the labor and services of the guardian and for small items of expenses paid by him for the labor and services of others, amounting in the whole to $415.12, should be allowed to him on the settlement of his accounts. 1. The proceedings, accounts, settlements and compensation of guardians are governed by the same rules as those of executors and administrators. (3 *R. S.* 246, § 22, *5th ed. Dayton's Sur.* 635, 639, *2d ed.*) 2. The surrogate has power not only to appoint these officers, but also "to direct and control their conduct." (3 *R. S.* 362, § 1, *subs.* 3, 7.) They are appointed by the surrogate, and he being authorized "to direct and control their conduct," they with great propriety look and apply to him for direction and advice, and within certain limits, that direction and advice, if followed, affords them protection. The surrogates' courts throughout the state recognize and approve of this practice, and it fully accords with the spirit and intent of the statute and decisions. Of course the surrogate must exercise his authority in the cases, and in the manner prescribed by statute. 3. Certain facts which appear from the testimony and the opinion of the surrogate, are worthy of notice. The guardian managed the estate with prudence, economy and good judgment; he filed his annual accounts after they were examined and corrected by the surrogate; they contained no gross errors or mistakes; there was no attempt at concealment, no keeping back accounts or vouchers or explanations, but the whole business was conducted by the guardian with fairness, frankness and entire good faith. 4. The material facts are all admitted; the services were rendered, the charges were reasonable, and the small items of expenses were paid out and included in the amounts for each year, and scarcely the faintest attempt was made on the hearing to controvert these facts. This is also

manifest from the opinion of the surrogate. He says "the evidence showed that the services were rendered;" but he disallows the charges on account of their supposed illegality. The matter therefore, very fortunately, is stripped of all difficulties of fact, and is reduced to the simple inquiry whether for such services rendered and expenses incurred in good faith the law denies all compensation. That such is not reason and substantial justice none will deny; that such is not the law can be demonstrated beyond a doubt. 5. The statute provides for the appointment of executors, administrators and guardians, defines their duties, and fixes their compensation. It provides that they shall receive for their services, besides their expenses, certain commissions on their receipts and disbursements. (3 R. S. 179, § 64. Id. 246, § 22.) A compensation is given for all the official and personal services of the officer, and the amount of it is ascertained by using as a basis of calculation that item of service which from its nature embraces or has direct reference to all or nearly all the other duties imposed upon him; namely, the receipt and payment of money. (McWhorter v. Benson, Hopk. 45, 46.) Now what are the duties of these officers? To receive and disburse money; to settle accounts in favor of and against the estates they have in charge; to rent and sell real and personal property in certain cases; to protect, preserve and manage to the best advantage the property and funds committed to them; to distribute and pay and deliver over these funds and property to those thereunto entitled, and to render an account of all their proceedings to the proper tribunals. As a general rule, and in the great variety of cases, these and such as these are the only duties imposed, and the only services rendered. (See the various provisions of the Revised Statutes, relative to executors, administrators and guardians; McWhorter v. Benson, Hopk. 45.) And it is for these services, prescribed by statute and rendered by the officer in his official capacity, that the same statute has fixed the commissions as a compensation; and it

is for these services that the decisions say nothing more can be allowed or received. Applying this principle to the case now before the court, the rule is in the very words of the law. "For the services of the guardian *as such*, the compensation is limited to the commissions allowed by law." (*Clowes* v. *Van Antwerp*, 4 *Barb.* 418. *Dayton's Sur.* 639.) "His commissions are in full for all his services *in discharge of his trust.*" (*Vanderheyden* v. *Vanderheyden*, 2 *Paige*, 287.) By the act of 1817, the court of chancery, in settling the accounts of guardians, executors and administrators, was authorized to make to them a reasonable allowance for their *services as such* guardians, executors and administrators. (*McWhorter* v. *Benson, Hopk.* 36.) These passages indicate distinctly that there is a class of services pertaining to guardians *in all cases*, and for these the commissions pay; and it also indicates that there *may* be services rendered by the person who is guardian, which are not included in this class, and for which the commissions are not given as a compensation. 6. The idea is an utter fallacy, that the commissions are a compensation for every service of every kind, which he who is a guardian may render for his ward or about his ward's property. Becoming a guardian does not destroy the individuality of the person; because he is a guardian he does not thereby cease from being any thing else; he does not lose his identity as a physician, a lawyer, a teacher, a farmer or mechanic. Notice some instances: If the guardian is a physician and renders professional services to his ward, does he do this as guardian, and do his commissions compensate him for these services? If he is a lawyer and renders professional services for his ward, or respecting her estate, does he do this in his capacity as guardian, and do his commissions make his compensation? This question has been before the courts, and they have decided that the guardian who is an attorney, and does legal business for his ward or respecting his estate, is entitled to his costs. (*In the matter of the Bank of Niagara,* 6 *Paige,* 216. *Dayton's Sur.* 496.)

If the guardian is a teacher and instructs his ward and furnishes his complete education, is all this labor and expense met by his commissions? If the guardian takes his ward into his own family and boards and provides for him during his entire minority, is all this to be done without any compensation except his commissions? If the guardian is a shoemaker, or a tailor, and makes the shoes or clothes of his ward, does he do this as guardian and receive his pay by his commissions? Suppose the guardian is a manufacturer of pianos and with his own hands makes one for his ward, is all this service included in his duties as guardian? And must he still look to his commissions for payment? Suppose he is a farmer and cultivates the land of his ward; or a mechanic, (a mason or a carpenter,) and makes proper and necessary repairs upon the buildings of his ward; or a day laborer, and in fact and good faith bestows useful labor upon his ward's property, secures his crops or carries them to market, does he do all as guardian, and is his remuneration to be limited to his commissions? And in order to save himself from loss, must he be careful always to employ a stranger to render the services which I have mentioned and others of like kind, which are constantly occurring? In other words, is the man altogether merged in the guardian so that all his acts and deeds which relate to, or affect his ward, are counted as the acts and deeds of the guardian? as his official duties in the discharge of the trust? 7. Such is not the law; the statutes of this state are not an iron rule, which bring all cases to a *verbal* standard irrespective of circumstances, and blind to justice and reason. There is no case which lays down any such rule as that contended for by the respondents; not a single case is reported where services such as I have mentioned have been regarded as within the official duties of the officer and therefore paid for by his commissions. Indeed, no case can be found in which the question has arisen in its present form, and it has been reserved for the boldness or the ingenuity of the contestants in the present instance to set up

an objection almost unknown in surrogates' courts in this state, and never tolerated to the prejudice of substantial justice. Whether correctly or not, the uniform and established practice in the surrogates' courts throughout this state is this: That for services of the kind rendered in this case, fairly rendered and satisfactorily proved, a reasonable compensation is to be made without reference to the commissions. In the reported cases in which some allowance above the commissions has been asked for and denied, it will be found that the services were strictly within the *official duties* of the executor or guardian. *Dayton*, (*Sur. p.* 496,) says: "He will not be allowed any other or further recompense, however great may have been his trouble or loss of time, *in conducting the administration ;*" speaking thus of *services strictly official*, and not of services such as I have mentioned above, and such as were rendered in the present instance. Several cases are reported in which executors have asked for special compensation in transacting the business of the trust, as agents, clerks, book keepers, and the like; and in these cases the applications were denied, and rightly so ; for the services rendered, though perhaps very burdensome, were such services as belonged strictly to the duties of the officer. (*Clinch* v. *Eckford*, 8 *Paige*, 412. *In Re Livingston*, 9 *id.* 440. *In Re Fisher*, 1 *Brad.* 335. *Dayton's Sur.* 497.)

8. But at this stage of the argument, one thing should be noted, to wit: That services rendered by executors, guardians, and the like, for which special compensation is claimed, should always be closely scrutinized. There is opportunity and danger of abuse, and whenever any thing of that nature is discovered the court will visit it with a heavy hand. In all cases, therefore, it is better for the officer to omit such services as far as practicable ; but if necessity, or clear and decided economy, require their rendition, then it is advisable to obtain the direction of the surrogate in advance, and that direction followed fairly and in good faith affords full protection. Clearly it is within the province of the surrogate to

give such directions, under the power "to direct and control the conduct" of guardians. (3 *R. S.* 362, § 1, *sub.* 7. *Bliss* v. *Sheldon,* 7 *Barb.* 152. *Same case,* 4 *Seld.* 34. *Willard on Executors,* 254.) The experience of every surrogate will suggest cases, in which he has given such directions, and certainly with the idea that he acted within the sphere of his duty in so doing. And the direction being given and followed by the guardian, is it not a sufficient protection? In the present instance, the guardian took this prudent course, and consulted with and obtained the direction of the surrogate in advance; and not only for the first year, but for every year, and for the years when $50 was allowed as well as for the others. In addition to this, his accounts in detail were submitted every year to the surrogate; they were closely examined, the guardian was sworn and testified as to the particulars, and after all this, the amounts were fixed, and the accounts passed by the surrogate. 9. And not to rely too much upon general principles, or general statements respecting the rule and practice in such cases, reference is made to the opinion of Mr. Bradford, the learned and accomplished late surrogate of the city and county of New York, upon a written statement submitted to him of the facts in this case. His long experience in office renders his opinion upon all questions of surrogate's practice worthy of great respect and confidence. He says: "The case is very clear. The commissions are only an allowance for the receipt and payment of moneys. For his *personal* services *as* guardian, there is no compensation; but for work done not as guardian, *under the permission of the surrogate,* there is no possible reason why he should not have the usual compensation." Can there be any doubt that these items should be allowed? The guardian must suffer great and manifest injustice if they are stricken out; while the justice and fairness of the account, (being for services actually rendered, and expenses in fact incurred,) the reason of the whole thing, the law of the land, the uniform practice

of the surrogate's court, and the actual direction and approval of the surrogate, at the time these services were rendered, and charges made, all indicate that they should be allowed.

II. A guardian is entitled to interest on advances made by him necessarily and in good faith, in the business of his ward, and this was the character of the advances made in the present instance, beyond a question. (2 *Williams on Executors* 1318, *and note. Dayton's Sur.* 500, 639. *Jennison* v. *Hassgood,* 10 *Pick.* 77.) If the rejected items for services are allowed, then a proper interest account should be made up from the date at which each item should have been allowed. (2 *Williams on Executors,* 1319.) If the surrogate was correct in striking out these items, then the annual balances are too small to render an interest account important.

III. A reasonable allowance should be made to the plaintiff from the estate, for his expenses, witnesses' fees and counsel. This should be done in view of the whole case, and whether the rejected items for services are or are not allowed. Observe the guardian's position from first to last; his fidelity in keeping and rendering his annual accounts; his readiness to bring on and complete a final settlement; the very trifling charges made in the account by the surrogate aside from the items for services, and the very considerable expense and trouble to which he has been subjected in attending so often before the surrogate. Even if the items for services were rightfully rejected, the reduction of the balance claimed by him, produced by striking out those items, does not furnish any reason for refusing him costs. In making those charges, he acted by the direction of the surrogate, and the items themselves were audited and allowed in his accounts by the surrogate. He surely should not be punished for the errors of the officer to whom he had a right to look for direction respecting his rights and duties.

*M. H. Throop,* for the respondent. I. The only question of any importance which arises upon this appeal, is whether

the surrogate was right in rejecting the items for "services
and expenses of the guardian," amounting in all to $415.12.
If they are rejected, there are in fact no "advances" upon
which it would be possible to allow any interest, as the yearly
receipts show that half of the time the guardian had a bal-
ance in his hands belonging to the ward, equal to the balance
on the side for the other half of the time. If, on the other
hand, the extra charge for services were allowed, still there
can be no interest charged to the ward, as the alleged "ad-
vances" would consist of the guardian's charges and com-
missions, and there is no rule of law which allows interest to
a guardian in such a case. The question of costs was dis-
cretionary with the surrogate. (2 *R. S.* 223, § 10. 3 *id.*
*5th ed.* 367, § 25.) If the decision upon this point could be
reviewed on appeal, this appellant would have no ground of
complaint, as it was more favorable to him than he had a
right to expect.

II. The surrogate was right in rejecting the appellant's
charges, over and above his commissions, for "sundry services
and expenses." 1. A guardian can have no allowances, ex-
cept his commissions, for any services of whatever nature,
or however meritorious they may have been. The rule is·
inflexible, and applies to all trustees whose compensation is
regulated by statute. The statutory allowance is all that they
can get from the trust fund, directly or indirectly, upon any
pretext whatever. "Guardians shall be allowed for their
reasonable expenses, and the same rate of compensation *for*
*their services* as is provided by law for executors." (2 *R. S.*
153, § 22; 3 *id. 5th ed. p.* 246, § 22.) "On the settlement
of the accounts of an executor or administrator, the surro-
gate shall allow to him *for his services,* . . . over and
above his expenses. 1. For receiving and paying out," &c.,
&c. (2 *R. S.* 93, § 58; 3 *id. 5th ed.* 179, § 64.) The lan-
guage of the statute is as broad as it could be made, and the
decisions so far from restricting it so as to include only services
rendered in the character of trustee, have given it its full

scope and meaning, and laid down the rule as broadly as I have stated it. The same rules which govern the settlement of executor's accounts, apply to the settlement of those of guardians, particularly as to compensation. (*Dayt. Sur. 1st ed.* 639; *id. 2d ed.* 691, 695.) This writer lays down the foregoing rule in the broadest terms, excepting only the case of a trustee who acts as attorney or solicitor for the estate, who, it is said, with a *semble* upon the authority of the case in 6th Paige, 213, can be allowed his *taxable costs* in this state, though the rule is otherwise in England. (*Dayt. 1st ed.* 496, 497; *id. 2d ed.* 538, 539.) If he drives his own horse and carriage, it is doubtful whether he can be allowed for their use. If so, he can't charge the price which he would have paid for the hire of a conveyance, for that would include a profit, and the policy of the law is against allowing him any thing. (*Id. 1st ed.* 498; *2d ed* 540; *see also Tiffany & Bullard on Trusts, pp.* 838, 842, 849, 854, 858.) The rule is also laid down in equally strong terms in the following cases: *McWhorter* v. *Benson,* (*Hopk.* 28.) *Vanderheyden* v. *Vanderheyden,* (2 *Paige,* 287.) *Fisher* v. *Fisher,* (1 *Bradf.* 336.) *Clinch* v. *Eckford,* (8 *Paige,* 412,) *and nearly fifty cases cited in the note to the 2d ed. of Paige. In the matter of Livingston,* (9 *Paige,* 440; 2 *Denio,* 575. *Clowes* v. *Van Antwerp,* (4 *Barb.* 416, 418.)

*In Re Bank of Niagara,* (6 *Paige,* 213.) This case is full to the point to sustain which I cite it, and it is not even authority that taxable or taxed costs are to be paid to the trustee out of the fund, for, as I read the case, the costs which were allowed to the receiver had been collected out of the other side and credited to the fund. But if I am wrong in this reading, the principle is not shaken, for the costs were fixed by statute, and may therefore be deemed a *statutory* allowance for those particular services. (*a*) It is very true that the primary object in view in passing the statute was to remove the inability of the courts to allow trustees compensation for their services, in the discharge of their

ordinary duties, but the statute is so worded and the courts have so construed it that nothing beyond the statutory allowances can be awarded to the *individual* for any services whatever. Indeed, if the statute was taken away entirely, the services charged for in this case could not be allowed, for the rule is of universal application, in the absence of any statutory qualification of it, that the trustee shall not directly or indirectly derive any benefit whatever from his trust, and compensation for these services should be denied, upon the same principle that a trustee is not allowed to purchase the trust estate for his own benefit, no matter how fairly he may have acted. (*Dayton, ubi supra. In Re Bank Niagara,* 6 *Paige,* 215.) (*b.*) Of the case before the court in 6th Paige, it may be said that no species of personal services can be subjected so directly to the supervision of the court, and afford less opportunity for abuse, than those of a counsel. Of this case it may be said that it is impossible to suggest a state of facts when there is greater probability of abuse and fraud, than when the trustee claims to be remunerated by a per diem compensation for services, of the necessity and extent of which he is the only judge. (*Mc Whorter* v. *Benson, Hopk.* 41, 42.) (*c.*) This case is absolutely studded with warnings against the danger of departing from the path which previous decisions have marked out. It appears that this guardian was for many years the tenant of one of the houses of the ward. In the double capacity of landlord and tenant, he was to fix the amount of the rent which he was to pay, and the case shows that he was so far subject to human frailty, that the present surrogate was compelled to increase the amount with which the guardian had charged himself for rent in the accounts which had been "allowed" by the late surrogate. This is a striking instance of the wisdom of the rule which forbids a man from acting in a double capacity—a rule of universal application in the law. (*Per Denio, C. J.,* 4 *Kern.* 91, 92.)

II. The testimony as to the "expenses" included in the

charges which were disallowed, is at least very vague, but it appears clearly that they were but trifling in amount, compared with the sums charged for services. And it is impossible for the court to make any allowance for them, because it is impossible to separate them from the illegal charges for services, the whole having been charged in gross, and the guardian being unable to specify either the items or the sum total of the expenses.

III. The "directions" and "allowances" by the late surrogate, and the various bargains between him and the guardian were without authority, and cannot affect the result either way. As to the settlement of the claim in 1856, and the arrangement for a fixed compensation in subsequent years, there is no pretense of these acts being those of the court, and we presume that even the learned counsel for the appellant will not pretend that a surrogate can pronounce *by deputy* an *oral* judgment, which shall bind *an infant who is not represented.* But the so called "allowances" in 1853, 1854 and 1855, were equally unauthorized. 1. The surrogate's court is a creature of the statute, and has no power or jurisdiction except such as the statute has bestowed upon it, either expressly or by implication. The statute has conferred upon it no power to settle a guardian's account *ex parte,* or to bind the ward by *ex parte* orders and proceedings in relation thereto. On the contrary, the whole scope and design of the statute, is that the accounts shall remain open till a final settlement, which can only take place upon a new guardian being appointed, or the ward coming of age. On the happening of either of these events, the interest of the ward will be properly represented and protected; until then there is but one party to the proceedings, and they are therefore *ex parte.* The "allowances" spoken of by the late surrogate, were wholly *coram non judice ;* his duty upon receiving the annual accounts being simply to file them. There is no provision in the statute for settling or allowing them ; the surrogate is not required to take any action unless

they are insufficient upon their face, in which case he is to take proceedings to procure "a more full and satisfactory account;" or unless they show waste, improvidence or misconduct, in which case he is to take proceedings to procure the guardian's removal. (3 *R. S. 5th ed.* 244, §§ 11, 12; 245, § 20; 246, § 28; 247, §§ 34, 35; 248, §§ 36, 37. *Dayt. Sur.* 2d ed. 696, 697. *Seaman* v. *Duryea,* 10 *Barb.* 523; 1 *Kern.* 324; *Farnsworth* v. *Oliphant,* 19 *Barb.* 30.) 2. The proceedings upon which the appellant relies, were taken without any notice to the minor, and without the appointment of any guardian to protect her rights. There is no court so high that its adjudications would not be void in such a case. 3. In order to render the decision of any tribunal of any binding effect, it should be made and entered in writing. The plain letter of the statute of 1837, (3 *R. S. 5th ed.* 248, §§ 36, 37,) shows that until the decision appealed from was pronounced, there was no *settlement of accounts* which bound the ward. If the allowance for personal services is attempted to be sustained on the idea that the work was done under the direction of the court to a trustee, over whom it had jurisdiction, it would be sufficient to say that the loose talk of a judge, in his office or elsewhere, is not such a direction as can create or take away rights, even if the conclusive objection did not exist, that the direction itself is not only unwarranted by all the rules of law, but is in the teeth of the statute limiting the compensation of guardians, as the same has been expounded by all the courts.

BACON, J. The only controversy between these parties as presented on this appeal, respects the disallowance by the surrogate of items in the guardian's accounts, amounting in the aggregate to some $400, consisting of charges running through six years, for his personal services and expenses in attending to and keeping in repair the property of which he had charge on behalf of his wards. If the surrogate had placed his decision upon the ground either that the services

Morgan *v.* Morgan.

had not been rendered, or that the charges were improper or extortionate, we should not probably have deemed it expedient to review, or reverse his final judgment. But in the opinion given by him in disposing of the case, it is expressly conceded that the services were rendered; but " the charges," he says, " are all disallowed on the ground that the commissions of the guardian cover every thing which can be allowed to him for his services respecting the estate of his ward."

This is placing the decision upon very simple and intelligible ground, and if the rule is as thus announced, and this case cannot for any other reason be excepted from its operation, then the judgment of the surrogate is right, and must be affirmed. Is it then, in the first place, the inflexible rule, that the commissions of the guardian cover " every thing" which can be allowed to him for his services " respecting the estate of his ward?" It will be conceded that the accounts, settlements and compensation of guardians are governed by the same rules that are either prescribed by law, or by the construction of the courts have been made applicable to those of executors and administrators. In the case of executors and administrators, the statute provides that they shall receive " *for their services,*" besides their expenses, certain fixed rates of compensation by way of commissions upon their receipts and disbursements. Now for what " services" is this compensation provided? Are they not, briefly and generally expressed, those which have respect to the proper management of the funds committed to their charge, to the duty of leasing and selling under certain circumstances, the real and personal estate, and to keeping and rendering just and accurate accounts ?

For services of this character, the statute has assumed that a certain rate of commission upon funds received and disbursed would afford a reasonable compensation, and has therefore fixed the rate accordingly. The rule is expressed in *Vanderheyden* v. *Vanderheyden,* (2 *Paige,* 288,) as follows : " The executor must be confined to the allowance of a fixed rate by

way of commission &c. in full for his services *in discharge of the trust.*" And in respect to guardians, in *Clows* v. *Van Antwerp*, (4 *Barb.* 418,) the court use substantially the same language, when they say that "for the services of the guardian *as such* the compensation is limited to the commissions allowed by law."

There are cases to be found in our reports where language has been used, and sometimes the application of a rule has been made, indicating that this rate of compensation covered the entire field of service and duty of the guardian, and would apparently deny him remuneration for personal services outside of his specific trust, and for moneys actually disbursed by him for the benefit of the estate. We have been referred to several such cases. They indicate a jealous scrutiny, such as should always be exercised by the courts, in respect to accounts against infants, and the estates of deceased parties, which experience shows are peculiarly liable to spoliation. In *McWhorter* v. *Benson*, (*Hopk.* 28,) it was held that the act of 1817 authorized the court to make an allowance to executors, for their services, at a fixed rate, but did not authorize any special allowances without regard to such rate. It did not appear in that case that the executor had performed any services outside of his peculiar duties in taking charge of the estate, but it did appear that he had employed an agent to manage the affairs of the estate, which were extended and complicated, and for this agent a specific compensation was allowed, and thus practically, although not directly, the rule was dispensed with in that case.

In *Clinch* v. *Eckford*, (8 *Paige*, 412,) it was held that the executors were not authorized to employ one of their number to perform extra services as clerk, in keeping the accounts of the estate, and to allow him a salary in addition to the commissions allowed by law. The keeping of the accounts is one of the specific and most appropriate duties of an executor in the discharge of his trust. In *Vanderheyden* v. *Vanderheyden*, (2 *Paige*, 287,) it was however decided that an executor

Morgan *v.* Morgan.

or guardian might employ a clerk or agent, and charge the expense to the estate, where from the peculiar situation or nature of the property, the services of such clerk or agent would be beneficial to the estate, although for his own services the statutory commissions only could be allowed. In the *Matter of Livingston,* (9 *Paige,* 440,) the same rule was held; the chancellor deciding that the committee of a lunatic could not receive an extra compensation for his services as clerk on behalf of the estate, but that such compensation was embraced in the allowance of commissions under the statute.

Such is the general scope and tenor of the cases. And from them I think the rule is fairly deducible, that where extra compensation has been applied for and denied, the services for which such remuneration was asked, were strictly, and it might perhaps be said peculiarly, within the official duties of the executor, guardian or trustee, and that no other recompense can be allowed than such as the statute provides for conducting the administration of the estate in all that legitimately pertains to it.

But I do not understand that this rule is so narrow and restricted that it denies all compensation to a guardian for services of a personal or professional character, rendered by him for the benefit of the ward, and in doing which he has bestowed personal labor, and incurred actual expenses, and which have been useful and serviceable to the estate. Several examples of this are indicated in the brief of the appellants' counsel; and it is pertinently said that by becoming a guardian the individuality of the person is not lost, nor is he any the less a physician, lawyer, farmer or mechanic, as the case may be. If in any such character he bestows services reasonable in amount and valuable in their nature, why should he be deprived of all compensation for them because in another character he has performed other services for which the law has made specific provision? In the case of an attorney who had performed professional services for his ward, the court of chancery has decided that he was entitled to the costs

of suits prosecuted by him on behalf of the estate. (*In the. matter of the Bank of Niagara,* 6 *Paige,* 213.) This decision, in my judgment, covers the whole ground, indicates the true rule to be applied to this case, and establishes the claim of the appellant to the compensation for services and expenses charged by him, it being conceded that those services were fairly and honestly rendered. If an attorney may charge for and collect his costs, which are in a large degree for his personal services, I am unable to see why a mechanic, for services in his line, rendered for his ward, is not entitled to the same measure of simple remuneration. It is no answer to say that the fees of the attorney are fixed by law, and are thus to be deemed a sort of statutory allowance; for although the items are fixed, they are no less intended to be and are in fact a compensation for purely personal services, and thus afford to the guardian or trustee a personal profit.

If this is the correct conclusion, it is decisive of this case, and leads necessarily to a reversal of the decree of the surrogate. But there is another aspect, still, in regard to which it may be doubted whether the surrogate did not err in rejecting these disputed items.

During the time these services were rendered, the guardian, upon reference to and consultation with the surrogate then in office, received from him instructions in regard to the manner in which the work should be done, how the account should be kept, and the amount of his compensation, and from year to year and every year covered by these charges, the account was rendered to the surrogate, examined carefully, and the amount fixed and allowed by him.

One of the duties of the surrogate prescribed by the statute in respect to guardians, is, " to direct and control their conduct." (3 *R. S.* 362, § 1, *sub.* 7.) And this seems to me just one of the cases where the direction of the surrogate having been invoked, the whole matter having been under his advice and control, the service rendered and the charges made pursuant to such direction, and the account scrutinized

Morgan *v.* Morgan.

and settled by him, it should have been conclusive upon his successor, and upon no just principle liable to be again opened and readjusted.

No hardship could in such a case occur to the wards; for their interests were in the keeping of the tribunal peculiarly set for their protection and defense, exercising therein precisely the office discharged by the surrogate now in office, and with equal and co-ordinate authority. Of such a case I should say, in the words of Surrogate Bradford, that although for services as guardian there is no other compensation than the commission fixed by law, yet "for work done not as guardian, under the permission of the surrogate, there is no possible reason why he should not have the usual compensation." It is not necessary, however, to put the case on this ground, as the other is conclusive.

The decree of the surrogate should be reversed, and the case sent back for a rehearing. The proper adjustment can undoubtedly be made upon the proof now before him, and he may perhaps deem it expedient to modify the order in regard to the costs of the proceeding, by charging them upon the estate.

MULLIN, J. concurred.

MORGAN, J. (dissenting.) It is a principle of general application that one having a trust to perform cannot bind the *cestui que trust* by a contract in his own behalf. The temptation which such an authority would hold out to the trustee to make a profit of the transaction, is a sufficient reason for adhering to the principle in all cases which come within its application. (*See Van Epps* v. *Van Epps,* 9 *Paige,* 241.) It is admitted that the guardian in this case had no right *as guardian* to perform the services and charge them to his ward. But I have failed to appreciate the distinction between his doing the services *as guardian* or as a mechanic. It is said that it is no part of the duty of the guardian to

drive nails and repair houses and fences.    But I am inclined
to think that it was the duty of the guardian either to do it
himself or to procure somebody else to do it.    He was under
no obligation to spend his time in doing the labor himself,
but had an undoubted right to procure some one else to do
it, and charge the expense to his ward.    If he did it himself,
he cannot make a profit out of it, for it is contrary to the
whole tenor of the decisions to allow the guardian to make a
profit in his dealings with his ward.    The profit belongs to
his ward, and not to the guardian.    It may be asked, what
are the profits in this case.    It is difficult to determine, and
. this very difficulty shows the importance of adhering to the
rule, which as I understand it, refuses to allow any thing to
the guardian except his commissions for personal services.
Plausible reasons are given for allowing the guardian, who
is a doctor, to charge the ward for services which he has ren-
dered to his ward as a physician ; and also to allow the guar-
dian a certain sum for board when it appears proper that the
ward should board in the family of the guardian.    It is easy
to see that in exceptional cases, such allowances would at
least be no more than would be paid for the same services to
others ; and the guardian might be willing in some cases to
board the ward cheaper than he could procure it elsewhere.
Of course the statute allowances would cover the actual ex-
penses of medicine and board in the cases supposed, and all
beyond that are profits.    It would doubtless prove a difficult
task to determine what was the actual expense of board, when
the account came before the surrogate ; but it is better that
the guardian should be put to this difficulty, than to allow
him to make a profit out of it.    I think the statute intended
to make full provision for the personal services of the guar-
dian, whether he is a physician or a mechanic, and that it is
a dangerous departure from the rule applicable to guardians
and wards to sanction the doctrine which is so ably defended
by the appellant's counsel in this case.    The chancellor in one
case allowed an attorney, who was guardian, to charge his

Morgan *v.* Morgan.

ward the taxable bill of costs when the interests of his ward had been in litigation.   It may be said of that case, that the statute and not the guardian, fixed the amount of the compensation.   Still the precedent is now urged to give color to charges in all cases where the guardian has performed services instead of procuring others to perform them.   I think that case stands quite alone as an authority in this state, and if it establishes a new principle, should not be extended to other cases not coming within its application.   It is an anomaly in legal language for a guardian to hire himself to do carpenter's work for his ward, and such a contract is clearly a violation of the principle which prohibits a trustee to act for himself while he has a duty to perform towards his ward, inconsistent with his own interest as an individual.   It might not lead to abuse if the guardian, as in this case, first obtained the consent of the surrogate to charge for such services, but it is for the legislature and not the courts to adopt such a rule, if it is found necessary and convenient.   There is no reason to doubt the good faith of the former surrogate in his dealings with the guardian here ; and it is not from any belief that injustice was done the infant by the former surrogate, that I feel constrained to sustain the decision of the present surrogate in disallowing the items of account which the former surrogate thought proper to sanction ; but I am unwilling to impair a rule so necessary to the safety of infants, and adopt a new one, which will hold out a strong temptation to guardians to eat up the estate of infants by similar charges.   The decision or opinion of the former surrogate in allowing for these services, while the ward was under age, was without authority.   (*Diaper* v. *Anderson,* 37 *Barb.* 168.)   I think the decree should be affirmed.

Decree reversed.

[ONEIDA GENERAL TERM, January 6, 1863.  *Mullin, Morgan* and *Bacon,* Justices.]